U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 APR 22 PM 2: 13

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 5:12-cr-130-1 |
| ) | |
| DENNIS B. ALLEN, JR. ) | |

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE AND
GRANTING OPPORTUNITY FOR FURTHER BRIEFING**
(Doc. 17)

This matter came before the court on March 11, 2013 for oral argument on Defendant Dennis B. Allen's motion to suppress evidence. (Doc. 17.) Defendant is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Defendant seeks suppression of physical evidence discovered at his apartment in Springfield, Vermont on July 27, 2012, as well as statements he made during police interviews on July 27, 2012[1] and October 12, 2012. (Doc. 17.) Defendant contends this evidence should be suppressed under the Fourth Amendment as the fruit of: (1) an illegal warrantless arrest in violation of *Payton v. New York*, 445 U.S. 573 (1980); and (2) an illegal search of his home, which police officers undertook at the time of his arrest without his consent. The Government opposes the motion, arguing that Defendant's warrantless arrest was not a *Payton* violation and officers lawfully accompanied

---

[1] Defendant contends that his July 27, 2012 statements should be suppressed as the product of custodial interrogation without the benefit of *Miranda* warnings. The Government "does not seek admission of statements [Defendant] made to local officers in his apartment." (Doc. 18 at 6). Accordingly, those statements shall not be admitted in the Government's case-in-chief. *See United States v. Douglas*, 525 F.3d 225, 248 (2d Cir. 2008) ("[S]tatements taken from a defendant in violation of his *Miranda* rights, though they may not be introduced by the government during its case-in-chief, are nonetheless admissible to impeach statements made by the defendant in the course of his testimony.").

REVERSED 3/31/2016 Pursuant to Mandate (Doc. 43)

Defendant into his home after his arrest and saw items in plain view which formed the basis for their subsequent search warrant.

Defendant does not challenge his arrest on the basis of lack of probable cause and the Government does not make a claim of exigent circumstances.

The Government is represented by Assistant United States Attorney William B. Darrow. Defendant is represented by Assistant Federal Public Defender David L. McColgin.

## I. Findings of Fact.

On or about July 25, 2012, the Springfield Police Department received a complaint from John Johnston, a resident of Springfield, regarding an alleged assault. On July 26, 2012, Springfield Police Officer Jeremy Fitzgibbons interviewed Mr. Johnston about the alleged assault, and Mr. Johnston informed him that a man he knew only as "DJ" had struck him twice on July 23, 2012. Mr. Johnston informed Officer Fitzgibbons that DJ lived in an apartment on Park Street, Springfield, Vermont. Based upon prior experience, Officer Fitzgibbons knew Defendant was known by the nickname "DJ" and lived on Park Street.

On July 27, 2012, Officer Fitzgibbons, accompanied by three other Springfield police officers, Detective Call, Detective Novasel, and Corporal Gilderdale, travelled to Defendant's apartment intending to speak with him, arrest him, and take him into custody for the assault. Defendant's apartment was located in a three-story wood frame building containing a hair salon on the first floor, and a single apartment on the second and third floors. A door at street level which opens to a stairway leading to the second floor provides entrance to the upstairs apartment. Neither the entrance nor the hallway or staircase are shared by other tenants. The officers rang the doorbell to the apartment (which according to Defendant was broken) and may have also knocked on the door. Defendant saw the officers from a sun porch on the second story of the building and recognized Detective Call with whom he had previous dealings. Defendant credibly testified that Detective Call waved to him and requested that he come downstairs and speak to him.

2

Defendant, wearing only socks, walked downstairs and opened the front door by pulling it towards him. He remained inside the threshold while the four officers stood outside on the sidewalk. The officers greeted Defendant and asked "How's it going today?" For the next five to six minutes, they spoke to Defendant about the alleged assault and the alleged victim in conversational tones. No weapons were drawn and the officers did not physically touch Defendant. Defendant informed the officers that he knew Mr. Johnston, but had not assaulted him and had not seen him in several days. He told the officers that Mr. Johnston had called him several times and handed his cell phone to the officers, who observed the calls and returned the phone to Defendant. The officers told Defendant that he had to come down to the police station for processing. Defendant testified that he asked whether he was under arrest and was told by Detective Call that he was not. Officer Fitzgibbons did not recall this exchange and did not recall any of the officers telling Defendant he was not under arrest. Defendant's briefs do not reference this statement by Detective Call. On balance, the court finds that it is unlikely that this statement was made unless it was made at the initiation of the conversation between the officers and Defendant as the pre-formed plan was to arrest Defendant for the alleged assault and process him down at the Springfield police station.

After the officers told Defendant that he would need to accompany them to the police station, Defendant asked the officers if he could go upstairs to tell his daughter he would be leaving with the officers and when he was coming back. He also expressed a need to retrieve his shoes. The officers advised Defendant he could not do so without the officers accompanying him because they wanted to ensure that he would come back out. When Defendant assured them that he would do so, the officers nonetheless insisted that they accompany him into the apartment. They also advised him that he may not be coming back.

Defendant did not object when the officers followed him upstairs into the apartment's living quarters. He credibly testified that he felt he had no choice because he was not willing to leave the apartment with the police officers without telling his 12-year-old daughter that he would be leaving. The officers escorted Defendant upstairs to the

3

apartment's living quarters and remained with Defendant for approximately ten to fifteen minutes during which time Defendant's daughter brought him a pair of shoes and Defendant spoke to her regarding what was happening. The officers questioned Defendant without giving him *Miranda* warnings. In preparation for taking Defendant into physical custody, Officer Fitzgibbons asked Defendant if he had anything in his pockets and Defendant took out certain items including seven bags of what appeared to be marijuana. The officers also saw certain items of potential contraband in plain view. Defendant left the apartment with the officers who handcuffed him outside the apartment, placed Defendant in a police cruiser, and transported him to the police station.

The police officers subsequently applied for and obtained a search warrant to search Defendant's apartment, based in part on what the officers observed in plain view in Defendant's apartment and upon what appeared to be marijuana in Defendant's pockets. The search warrant affidavit also included statements Defendant made to the officers while in the apartment. During the execution of the warrant, also on July 27, 2012, police officers discovered a firearm in Defendant's bedroom. Defendant was later given *Miranda* warnings and interviewed on October 12, 2012, at which time he made inculpatory statements and admitted to possession of the firearm.

## II. Conclusions of Law and Analysis.

The Government bears the burden of justifying Defendant's warrantless arrest. *See United States v. Reed*, 572 F.2d 412, 424 (2d Cir. 1978). In the event it sustains this burden, if a defendant identifies an alternative basis for suppression, "the Government bears the burden of proving, by a preponderance of the evidence, that the officers' actions were lawful." *United States v. Torres*, 2011 WL 2209144, at *5 (S.D.N.Y. June 7, 2011) (quoting *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010)).

### A. The Location of Defendant's Arrest.

Defendant contends that his October 12, 2012 statements and all physical evidence must be suppressed because they are the fruit of an unconstitutional arrest. Although the parties agree that Defendant was arrested without a warrant, they dispute the precise time and location of the arrest. The Government contends that Defendant was arrested when

4

the officers informed him from outside the apartment doorway threshold that he would need to accompany them to the police station for "processing" on the assault charge and Defendant submitted to this request. Defendant counters that he was not arrested at that time, but, instead, was arrested only after he had entered the apartment in acquiescence to the officers' demand that they accompany him.[2]

"An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991). Accordingly, while "[m]ere words will not constitute an arrest . . . on the other hand, no actual, physical touching is essential." *Id.* at 626. As a result, where there is no physical force, courts require *both* an assertion of authority by law enforcement and submission to that authority by the defendant before an arrest may be deemed to have taken place.

For example, in *Dunaway v. New York*, 442 U.S. 200 (1979), police officers approached a suspect at his neighbor's home and, without informing him that he was under arrest, ordered him to accompany them to the police station. The Court explained that the order and the suspect's subsequent submission amounted to an arrest rather than a "less intrusive" seizure because the suspect "was not questioned briefly where he was found" but rather "was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room." *Id.* at 210-12. Similarly, in *Kaupp v. Texas*, 538 U.S. 626 (2003), a suspect "was awakened in his bedroom at three in the morning by at least three police officers, one of whom stated 'we need to go and talk.'" *Id.* at 631. The suspect responded "Okay," and he "was taken out in handcuffs, without shoes, dressed only in his underwear in January, placed in a patrol car, driven to the scene

---

[2] In his motion to suppress, Defendant initially asserted "he was arrested, or seized, for Fourth Amendment purposes from the moment he was told he was being taken down to the police station to be processed on the assault charges" (Doc. 17 at 7 n.3) and "certainly once Officer Fitzgibbons 'advised Allen that he would need to come down to the PD with us to be processed for the assault,' there was no question but that he was under arrest." *Id.* at 12 (internal citation omitted). In his reply, Defendant characterized these assertions as "poorly worded" (Doc. 22 at 7 & n.2), and contended that his "allowing entry into his residence constituted the required second step of 'submission to the assertion of authority' and marked the 'arrest' under *Hodari D.*" (Doc. 22 at 8.) At oral argument, Defendant asserted that the arrest took place inside his apartment.

5

of a crime and then to the sheriff's offices, where he was taken into an interrogation room and questioned." *Id.* The Court found that "[t]his evidence points to arrest even more starkly than the facts in *Dunaway*," because although the suspect was not told he was under arrest, the officers' "words 'we need to go and talk' present[ed] no option but 'to go[,]'" and "[t]here is no reason to think [the suspect's] answer was anything more than 'a mere submission to a claim of lawful authority.'" *Id.* at 631. In *United States v. Holland*, 755 F.2d 253 (2d Cir. 1985), the Second Circuit found that a suspect was arrested when he opened the door to the common area of his apartment building, after a police officer "drew his gun, displayed his badge and said, 'Doc, this is business.'" *Id.* at 254. The court observed that "[f]rom that time on, [the suspect's] liberty of movement was restricted, and he could not reasonably have believed that he was free to leave. He was under arrest." *Id.*

Here, after the initial conversation at the threshold of Defendant's apartment, the police officers informed Defendant that he would "have" to accompany them to the station to be processed for the assault. They verbally communicated this order to Defendant across the threshold and did not make any physical contact with him. When Defendant asked for permission to talk to his daughter and retrieve his shoes, he acknowledged the officers' show of authority and their intent to limit his freedom of movement.[3] When the officers denied Defendant permission to do so without a police escort, Defendant effectively agreed to the police escort as a condition precedent to his

---

[3] Even if Detective Call told Defendant he was not under arrest at some point during their conversation, any doubt as to whether Defendant was free to leave was dispelled when the officers informed Defendant that he could not access the living quarters of his apartment without a police escort. In such circumstances, courts hold that a statement that a defendant is not under arrest is insufficient to counterbalance the hallmarks of a formal arrest. *See United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007) (suspect was in custody during a three hour interrogation within a police vehicle, despite being "explicitly told he was not under arrest," because a reasonable person in his position "would have felt that his freedom was curtailed to a degree associated with formal arrest"); *United States v. Jackson*, 377 F.3d 715, 717 (7th Cir. 2004) (finding that a suspect was under arrest when officers handcuffed him and stated "he was not 'under arrest' but was just being 'detained,'" because the suspect was involuntarily held for an "indefinite period," and noting that "[i]t does not matter for current purposes what label the officer applied at the scene; analysis under the fourth amendment is objective").

6

returning to the living quarters of his apartment. Although the test is an objective one, Defendant, himself, conceded in his testimony that the officers' statements presented Defendant with no option but to comply. *See also* Doc. 17 at 3 (arguing that "[h]aving no alternative, [Defendant] let the police follow him upstairs").

Defendant's submission to the police officers' authority occurred while Defendant was inside the threshold of his apartment and the officers were outside on the sidewalk. Courts and commentators have recognized that an "across the threshold" arrest may take place in this manner. *See McClish v. Nugent*, 483 F.3d 1231, 1241 (11th Cir. 2007) ("This is not to say, of course, that a suspect may not surrender to the police—there is nothing in *Payton* that prohibits a person from surrendering to police at his doorway.") (citation omitted); *United States v. Berkowitz*, 927 F.2d 1376, 1386 (7th Cir. 1991) ("It is true that [the suspect] was still standing inside his home when [the officer] told him he was under arrest. But *Payton* prohibits only a warrantless *entry* into the home, not a policeman's use of his voice to convey a message of arrest from outside the home."); *see also Knight v. Jacobson*, 300 F.3d 1272, 1277 (11th Cir. 2002) ("*Payton* keeps the officer's body outside the threshold, not his voice. It does not prevent a law enforcement officer from telling a suspect to step outside his home and then arresting him without a warrant. In that situation, the officer never crosses 'the firm line at the entrance to the house' which is where *Payton* drew the line."); *United States v. Vaneaton*, 49 F.3d 1423, 1427 (9th Cir. 1995) (ruling arrest lawful because "[t]he police did not enter the house until they formally placed Vaneaton under arrest"); *United States v. Carrion*, 809 F.2d 1120, 1128 (5th Cir. 1987) (warrant was not required when a suspect was arrested at gunpoint after opening his hotel room door in response to police knocking, because "the arrest was effected before the agents entered [his] hotel room"); Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 6.1(e) (5th ed. 2012) (citing cases and arguing that under the rationale of *Payton*, "*if* the arrest can be accomplished without entry, it should be deemed lawful notwithstanding the absence of a warrant, *even if* the arrestee was just inside rather than on the threshold at the time"). The court must

7

thus consider whether an "across the threshold" arrest based upon law enforcement's summoning Defendant to that location is constitutional under controlling precedent.

### B. Whether Defendant's Warrantless Arrest Violated the Fourth Amendment.

Defendant contends that because at all times he remained inside the threshold of his apartment and only came to the threshold in response to a police officer's summons, he was unconstitutionally arrested in his home under *Payton*. He argues that this element of police coercion controls the outcome even in "across the threshold" arrests. The Government counters that there is no *Payton* violation where officers do not physically enter the home to effectuate an arrest, regardless of how a defendant came to be standing in the threshold.

In *Payton*, the Supreme Court addressed "whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest." *Id.* at 575 (quotations omitted). The case involved two sets of facts, both of which involved officers entering a suspect's home to arrest him without first obtaining consent or a warrant. In the first situation, police officers used a crowbar to break into a suspect's apartment who they mistakenly believed was at home, and once inside discovered inculpatory evidence. In the second, a suspect's son opened the front door of his house when police officers knocked on the door. Seeing the suspect through the door, the officers quickly entered the home to arrest him, and discovered inculpatory evidence while conducting a search of the immediate area. The *Payton* Court found both warrantless entries unlawful, noting that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *id.* at 586, and "at the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Id.* at 589-90 (internal citations and alterations omitted). The Court suppressed evidence obtained in both instances, holding that the Fourth Amendment "has drawn a firm line at the entrance to the house" and that "[a]bsent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 603; *see also Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (per curiam)

8

(reaffirming firmly established rule that "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home").

In *United States v. Santana*, 427 U.S. 38 (1976), the Court explained *Payton*'s application to certain "threshold" arrests. In *Santana*, police officers observed a suspected heroin dealer standing in the doorway of her house with a paper bag. When the officers shouted "police" and displayed their identification, the suspect retreated into her home dropping envelopes of what was later determined to be heroin as she did so. The officers, acting without a warrant, followed the suspect through the open doorway in hot pursuit and placed her under arrest. The *Santana* Court held that the suspect's Fourth Amendment rights had not been violated because she had knowingly exposed herself to the public by standing in her open doorway and, therefore, retained no expectation of privacy when the officers arrested her after following her into her home under exigent circumstances. The Court noted that the police first sought to arrest the suspect in a public place where she "was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.* at 42. The court held that the suspect's retreat into her house could not thwart an otherwise proper arrest where the police were in hot pursuit and where there was "likewise a realistic expectation that any delay would result in the destruction of evidence." *Id.* at 43.

Following *Santana*, courts have generally found that the police may lawfully arrest a suspect for a felony without a warrant if the suspect voluntarily exposes himself or herself to public view. *See United States v. Gori*, 230 F.3d 44, 52 (2d Cir. 2000) (finding that a warrant was not required to arrest suspects who "voluntarily opened the door of [their apartment] in response to a knock from the delivery person whom they invited [and] created a vista from a public place or common area" because "a suspect exposed to public view through an open doorway, even at home, cannot claim a protected privacy interest that triggers the warrant requirement"); *McKinnon v. Carr*, 103 F.3d 934, 935 (10th Cir. 1996) (a suspect "standing in the threshold of his doorway, open to public view" has no expectation of privacy and thus police may arrest him without a warrant);

9

*Duncan v. Storie*, 869 F.2d 1100, 1102 (8th Cir. 1989) ("The doorway of an individual's home or apartment or hotel room may be a public place for the purpose of making a warrantless arrest if the individual has come to stand in the doorway voluntarily."); *Carrion*, 809 F.2d at 1128 (*Santana* applied and arrest held lawful where suspect's "arrest occurred as he stood in the doorway of his hotel room and was first confronted by agents . . . who were standing in the hallway"). As the Second Circuit explained in *Gori*:

> *Santana* says that the suspect in that case was "standing directly in the doorway—one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." We read this passage as descriptive, not as the formulation of a rule under the Fourth Amendment. The Court elsewhere has warned against employing "metaphysical subtleties" to resolve Fourth Amendment challenges, and we therefore doubt that it is appropriate to resolve a *Payton* challenge on the basis of a suspect's placement within a visible scene. . . . A person who opens the door to a dwelling in response to a knock by an invitee opens to view whatever can be seen by a nosy neighbor or an observant police officer. Those inside exhibit no actual expectation of privacy and therefore lose the heightened constitutional protection that might flow from such an expectation.

*Gori*, 230 F.3d at 54 (internal citations omitted). The *Gori* court left open the question of whether *Santana* applies when police knock on a suspect's door or otherwise summon the suspect to the threshold, noting a split of authority on this issue:

> Because the defendants opened the door in response to a knock initiated by someone whom they invited—not by the police or someone acting as a subterfuge for the police—we need not consider whether a suspect loses the heightened protection of *Payton* merely by opening a door in response to a knock by law enforcement. *Compare Vaneaton*, 49 F.3d at 1427 (recognition and submission to police authority required), and *Berkowitz*, 927 F.2d at 1387 (same) with *Carrion*, 809 F.2d at 1128 (no expectation of privacy when open door in response to knock, even if the police use subterfuge), and [*United States v.*] *Herring*, 582 F.2d [535], 543 [(10th Cir. 1978)] (*Payton* inapplicable whenever suspect opens door).

*Id.* at 52 n.4.

The *Gori* court drew a distinction between an arrest of a suspect who has voluntarily exposed himself or herself to the public independently of any inducement by law enforcement (and has thereby lost his or her expectation of privacy) from an arrest

10

that occurs because a suspect exposes himself or herself in response to police summoning. Although the latter circumstance poses a closer question because the suspect may retain an expectation of privacy while inside the threshold of his or her home, the majority of circuits, including the Second Circuit, have found the distinction is not dispositive. Instead, the pivotal inquiry is whether law enforcement crossed the threshold of the home in order to effectuate the arrest. Second Circuit precedent makes this point clear.

For example, in *United States v. Crespo*, 834 F.2d 267 (2d Cir. 1987), the Second Circuit found that *Payton* required a warrant for the arrest of a suspect who partially opened his door in response to a police informant's knock, then "either slammed the door shut when he saw [police approaching] or already had closed the door and retreated into his apartment" when police officers displayed their weapons, kicked the door, and caused it to be opened with a "threat of force and not with consent." *Id.* at 269. "Once the agents entered the apartment . . . Crespo was arrested, handcuffed and given *Miranda* warnings." *Id.* The court held that, unlike in *Santana*, "the door to the apartment was at most half-opened and, indeed, even that degree of exposure was induced by the [police] agents who were seeking to flush [the suspect] out [and] *Payton* would apply under such circumstances so as to prohibit the entry into the home." *Id.* (internal citations omitted).

In *Loria v. Gorman*, 306 F.3d 1271 (2d Cir. 2002), the Second Circuit held that officers violated the Fourth Amendment when a suspect's friend opened the suspect's front door in response to police knocking, the suspect subsequently attempted to close the door, and an officer responded by pushing the door open, entering the home, and arresting the suspect. The court noted that, "[a]s the Supreme Court held in *Payton*, 'the Fourth Amendment has drawn a firm line at the entrance to the house[,]'" *id.* at 1284 (quoting *Payton*, 445 U.S. at 590), and "[s]ubsequent holdings have reiterated that principle and 'made clear that any physical invasion of the structure of the home, by even a fraction of an inch, is too much' to be tolerated." *Id.* (quoting *Kyllo v. United States*, 533 U.S. 27, 37 (2001)). The court found that the arrest was unlawful because "by stepping into the house, [the police officer] crossed *Payton*'s 'firm line' and implicated

11

its protections. No invasion of the sanctity of the home can be dismissed as *de minimis*."
*Id.*

In *United States v. Reed*, the court held that "warrantless felony arrests by federal agents effected in the suspect's home, in the absence of exigent circumstances, even when based upon statutory authority and probable cause, are unconstitutional." 572 F.2d at 418. The court noted that there were three different versions of where the arrest took place:

> Agent Bell testified that he placed Reed under arrest in the living room-dining room part of the apartment after advising her at the door that his purpose was to place her under arrest. Reed testified that the agents 'rushed in' immediately after she pulled the door open and then arrested her. The district court believed that Reed was arrested when she opened the door. No matter which of these versions is the most accurate, Reed's arrest was effected not in a 'public' place but in a place protected by the Fourth Amendment. She was not arrested in the hallway of the apartment building. Nor was she standing on the threshold of her apartment in such a way that she would have been inside the apartment by taking a step backward and 'outside' by taking a step forward. She was not 'as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house. *Rather, she was arrested inside her home*.

*Id.* at 422-23 (internal citations and footnotes omitted) (emphasis supplied). While purporting to credit all three versions of the facts, the Second Circuit specifically found that Reed's arrest took place "*inside her home*[,]" *id.* at 423, and not "across the threshold." It was this distinction which gave rise to suppression because as the *Reed* court explained: "To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the home. This is simply too substantial of an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present."
*Id.*

In this case, although Defendant was summoned by police officers to the threshold of a private stairway that led to his living quarters, thereafter he remained in that location for five to six minutes engaged in a consensual conversation with the police that was free

12

from any coercion, trickery, deception, threats, or show of force. He was close enough to the police officers to hand his phone to them and for them to hand it back to him. Accordingly, any reasonable expectation of privacy he had was diminished by his decision to participate in an encounter with the police officers that exposed his voice, person, and belongings to their view, inspection, and touch. Although the evidence is not precise on this issue, Defendant literally appeared to be standing on the threshold of his apartment so that with one step backward he could retreat within the stairwell and with one step forward he would be on a public sidewalk. The police officers did not enter Defendant's apartment in order to effect his arrest; rather their physical entry into the home occurred only after Defendant was arrested at this request so that he could retrieve his shoes and advise his young daughter that he was leaving. The police could have transported Defendant to the police station without agreeing to either of these requests.

Under *Payton*, *Santana*, and Second Circuit precedent, even though the police officers summoned Defendant to the threshold of his apartment, their "across the threshold" arrest in this case was lawful and did not violate the Fourth Amendment because it did not involve a physical intrusion into Defendant's home to effect the arrest. *See Payton*, 445 U.S. at 590 (drawing a "firm line" at the threshold of the home, observing that "this threshold may not reasonably be crossed without a warrant"). Defendant's motion to suppress on the grounds that his arrest unconstitutional is therefore DENIED. The court thus turns to whether police officers thereafter needed Defendant's consent or a warrant to follow him into his apartment.

### C. Whether the Officers' Entry into Defendant's Apartment Violated the Fourth Amendment.

Defendant argues that even if his arrest was lawful, the officers violated his Fourth Amendment rights by following him into his home when he went inside to put on shoes and inform his daughter that he was leaving. Although Defendant admits that he did not object to the officers accompanying him inside, he argues that his consent was involuntary. The Government counters that the officers' entry was lawful and

REVERSED 3/31/2016 Pursuant to Mandate (Doc. 43)

Defendant's consent was unnecessary, because officers are authorized under federal law to accompany an arrested suspect inside the suspect's home.

There is no dispute that the evidence in the apartment was either in plain view or was retrieved from Defendant's pockets as a search incident to arrest. "It is, of course, an essential predicate to any warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136 (1990). The question is thus whether the police officers' escort of Defendant into his home was lawful.

The Supreme Court has held that when an officer has placed a suspect under lawful arrest, "[t]he officer ha[s] a right to remain literally at [the suspect's] elbow at all times; nothing in the Fourth Amendment is to the contrary." *Washington v. Chrisman*, 455 U.S. 1, 6 (1982). The Court therefore held it was lawful for the police officer to accompany the arrested defendant, who requested an opportunity to retrieve his identification, into his dormitory room. The Court rejected the notion that a police officer's right to accompany a defendant was conditioned by the specific facts and circumstances of the case:

> The central premise of the opinion of the Supreme Court of Washington is that Officer Daugherty was not entitled to accompany Overdahl from the public corridor of his dormitory into his room, absent a showing that such "intervention" was required by "exigent circumstances." We disagree with this novel reading of the Fourth Amendment. The absence of an affirmative indication that an arrested person might have a weapon available or might attempt to escape does not diminish the arresting officer's authority to maintain custody over the arrested person. Nor is that authority altered by the nature of the offense for which the arrest was made.
>
> Every arrest must be presumed to present a risk of danger to the arresting officer. There is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of the potential danger. Moreover, the possibility that an arrested person will attempt to escape if not properly supervised is obvious. Although the Supreme Court of Washington found little likelihood that Overdahl could escape from his dormitory room, an arresting officer's custodial authority over an arrested person does not depend upon a reviewing court's after-the-fact assessment of the particular arrest situation.

14

*Id.* at 6-7 (internal citations omitted). The Court further held that if while accompanying the arrested person, the officer sees contraband in plain view, he or she may lawfully seize it. *Id.* at 9 ("This is a classic instance of incriminating evidence found in plain view when a police officer, for unrelated by entirely legitimate reasons, obtains lawful access to an individual's area of privacy. The Fourth Amendment does not prohibit seizure of evidence of criminal conduct in these circumstances.").

Following *Chrisman*, the Second Circuit has held that officers were authorized to follow a person they had arrested without a warrant into her apartment "for the purpose of affording her the opportunity to change clothes." *Contreras v. United States*, 672 F.2d 307, 309 (2d Cir. 1982); *United States v. Di Stefano*, 555 F.2d 1094, 1101 (2d Cir. 1977) ("Having permitted [the arrested person] to retire to her bedroom to dress, [law enforcement] was clearly justified in accompanying her to maintain a 'watchful eye' on her and to assure that she did not destroy evidence or procure a weapon."); *see also United States v. Harness*, 453 F.3d 752, 756 (6th Cir. 2006) (ruling "deputies plainly had authority to follow Harness into his house when he sought to retrieve his keys, wallet, and cigarettes. At that point, the deputies had placed Harness under arrest and thus had every right 'to remain literally at his elbow at times'; Harness' response that the police somehow 'coerced' his consent to enter the house misses the point. The issue is not consent but the risks officers would incur by allowing an arrested criminal suspect to roam freely about his home: risks to officer safety, risks of the destruction of evidence, risks of escape[.]").

Because Defendant was arrested before the officers accompanied him into his home, there was no Fourth Amendment violation triggered by their decision to remain in his presence while he prepared to be transported to the police station. Accordingly, any contraband the officers saw in plain view was not the result of a constitutional violation and need not be suppressed. *See Chrisman*, 455 U.S. at 9. Similarly, police officers were permitted to require Defendant to take items, including contraband, out of his pocket as a lawful search incident to arrest. *See United States v. Robinson*, 414 U.S. 218, 227 (1973)

15

(holding that a search incident to a valid arrest is not limited to a frisk of a suspect's outer clothing and the removal of weapons but may include the removal of contraband).

### D. Use of Defendant's Statements Inside of the Apartment to Obtain Search Warrant.

Neither party has addressed the further question of whether the search warrant remained valid notwithstanding the fact that it contained statements Defendant made in his apartment which appear to have been obtained in violation of *Miranda*. Under *United States v. Patane*, 542 U.S. 630, 643 (2004), the physical fruits of a *Miranda* violation are not suppressed as the fruit of the poisonous tree. However, in the Second Circuit, "[w]hen an affidavit in support of a search warrant contains information which is in part unlawfully obtained, the validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue." *United States v. Marchand*, 564 F.2d 983, 993 (2d Cir. 1977); *see also United States v. Reilly*, 76 F.3d 1271, 1282 n.2 (2d Cir. 1996) (holding when evidence illegally obtained is later used to obtain an otherwise valid search warrant, "[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant"). As the Second Circuit has pointed out, "[o]ther circuits have held squarely that the presence of illegal evidence in affidavits presented for a search warrant does not prevent a finding of probable cause sustainable on other grounds." *Marchand*, 564 F.2d at 994 (collecting cases).

In *United States v. Ramos*, 2012 WL 1854747 (D. Vt. May 21, 2012), this court concluded that a search warrant lacked probable cause where it was obtained solely on the basis of evidence obtained in violation of *Miranda* and as the result of an unlawful detention. Here, the outcome is less certain because, in addition to Defendant's statements, police officers observed contraband in plain view and saw what appeared to be marijuana emerge from Defendant's pockets as the result of a search incident to arrest. There is also the further possibility that law enforcement reasonably relied upon what appeared to be a facially valid warrant in seizing the firearm found in Defendant's

16

bedroom. *See United States v. Leon*, 468 U.S. 897 (1984) (holding that the Fourth Amendment's exclusionary rule does not bar admission of evidence obtained as the result of good faith, reasonable reliance upon a search warrant issued by a neutral and detached magistrate that was later found to be invalid).

In the absence of further briefing by the parties, the court does not address these issues further. It, however, permits Defendant to re-open his motion to suppress should he desire to do so. The court finds that there will be no undue prejudice in affording Defendant this opportunity because prior to the Government's opposition to his motion to suppress, Defendant had no notice that the Government would not seek to admit his statements made in the apartment in his case-in-chief. Although Defendant did not squarely address the use of his statements in the search warrant affidavit, he clearly sought suppression of those statements in his initial motion. *See* Doc. 17 at 12 (stating that because there was "no question but that [Defendant] was under arrest. *Miranda* warnings were therefore required prior to any interrogation. Since no warnings were given, all answers Mr. Allen gave in response to police questioning must be suppressed.").

### E. Whether October 12, 2012 Statements Should Be Suppressed.

Defendant seeks suppression of his statements on October 12, 2012 solely on the grounds that they are the fruits of an illegal arrest. *See* Doc. 17 at 1 ("Mr. Allen's statements and the physical evidence discovered were the fruits of this illegal arrest and must therefore be suppressed."). He does not make the alternative argument that they are the fruits of his prior statements made at the time of his arrest in response to police interrogation without the benefit of *Miranda* warnings.

In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Court addressed whether law enforcement officers had engaged in a deliberate two-step strategy to circumvent *Miranda* by first interrogating a suspect without *Miranda* warnings until she gave a full confession and then, after brief hiatus in the questioning, administering *Miranda* warnings and obtaining a second confession. The Court held that the post-warning statements should be suppressed, with a plurality concluding that the post-warning

17

statements should be suppressed because the officers' two-step strategy rendered the *Miranda* warnings ineffective. The plurality found five objective factors relevant to the inquiry: (1) "the completeness and detail of the questions and answers in the first round of interrogation;" (2) "the overlapping content of the two statements;" (3) "the timing and setting of the first and second" interrogations; (4) "the continuity of police personnel" doing the questioning; and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 611-12 (plurality opinion).

Justice Kennedy supplied the fifth vote for suppression in *Seibert*, but disagreed with the plurality's reasoning, arguing that "an objective inquiry from the perspective of the suspect [that] applies in the case of both intentional and unintentional two-stage interrogations . . . cuts too broadly." *Id.* at 621-22 (Kennedy, J., concurring). He noted that law enforcement may be faced with circumstances in which "[a]n officer may not realize that a suspect is in custody and warnings are required" and argued that in such circumstances "it would be extravagant to treat the presence of one statement that cannot be admitted under *Miranda* as sufficient reason to prohibit subsequent statements preceded by a proper warning." *Id.* at 620. He concluded that whether the statements were voluntary should be the linchpin unless a "*deliberate* two-step strategy was employed," in which case "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures[,]" such as "a substantial break in time and circumstances" or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement[,]" are "taken before the postwarning statement is made." *Id.* at 622.

The Second Circuit has held that "Justice Kennedy's concurrence in *Seibert* is controlling" and "the prosecution bears the burden of disproving by a preponderance of the evidence that the government employed a deliberate two-step strategy to deprive the defendant of the protections afforded by the Fifth Amendment." *United States v. Moore*, 670 F.3d 222, 229 (2d Cir. 2012). In engaging in this inquiry, "a court should review the totality of the objective and subjective evidence surrounding the interrogations in order to

18

determine deliberateness." *United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012) (quoting *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010)).

As the threshold for any *Seibert* inquiry, the Second Circuit has required a "straightforward analysis" asking "[f]irst, was the initial statement, though voluntary, obtained in violation of the defendant's *Miranda* rights? If not, there is no need to go further." *See Moore*, 670 F.3d at 229 (citing *United States v. Courtney*, 463 F.3d 333, 336 (5th Cir. 2006)); *see also United States v. Ferguson*, 2011 WL 1347002, at *7 (S.D.N.Y. Apr. 4, 2011) ("Because the initial non-*Mirandized* questioning . . . was not illegal, it is unnecessary for the Court to address the defense's further arguments as to whether there was improper 'two-step' questioning that would preclude the admission of his additional, post-Miranda statements to authorities.").

In this case, neither party has addressed by way of evidence or otherwise the totality of the circumstances of Defendant's October 12, 2012 statements. In the absence of this factual information, the court cannot and will not address the issue *sua sponte*. The court therefore DENIES Defendant's motion to suppress these statements as the fruits of an unlawful arrest. The court will, however, grant Defendant an opportunity to address any alternative grounds for suppression of the October 12, 2012 statements now that the court has ruled on the legality of Defendant's arrest and now that the Government has confirmed that it will not seek to introduce at trial Defendant's July 27, 2012 post-arrest statements made in his apartment.

## CONCLUSION

For the reasons stated above, the court DENIES Defendant's motion to suppress (Doc. 17) and hereby GRANTS Defendant permission to further brief any remaining grounds for suppression within twenty (20) days of this Order and affords the Government an opportunity to respond to any such briefing within the time afforded by the Federal Rules of Criminal Procedure and this court's Local Rules.

19

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 22nd day of April, 2013.

Christina Reiss, Chief Judge
United States District Court

REVERSED 3/31/2016
Pursuant to Mandate
(Doc. 43)